Judge John H. Chun

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>MATTHEW MCDONAGH<br><br>Defendant. | NO. 24-cr-120-JHC<br><br>UNITED STATES SENTENCING MEMORANDUM REGARDING MATTHEW MCDONAGH |

Matthew and Patrick McDonagh traveled around the country claiming they were contractors. They approached victims at their homes with a line that they were doing work in the neighborhood and that the victim's house needs urgent repairs. These were lies—the McDonaghs typically were not working in the neighborhood, and the victims' homes did not require the repairs the McDonaghs identified. These initial lies, and those that followed, were designed to give the McDonaghs a foothold doing superficial work on the victims' homes. The McDonaghs would then claim to find more and more items that needed fixing, usually culminating in a lie that the foundation or masonry was cracked. All the while, the McDonaghs charged their victims exorbitant sums for building materials they didn't use and work they didn't do.

United States' Sentencing Memorandum - 1
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Using this scam, the McDonaghs stole $435,000 from Victim 1 in King County, including more than $350,000 from his retirement account. Matthew McDonagh targeted other victims as well, including Victim 4 in Illinois, whom he defrauded for more than $75,000. For these crimes, the United States joins the U.S. Probation Office in recommending the Court sentence Matthew McDonagh to 24 months in prison.

## I. BACKGROUND

### A. The McDonaghs targeted King County resident Victim 1

*1. The McDonaghs lied to Victim 1 about the state of his home.*

Victim 1 is an older adult who lives in north King County. On January 11, 2024, Matthew McDonagh knocked on Victim 1's back door and stated he was a contractor doing work in the neighborhood. Plea Agreement ¶ 8.g. These were lies—Matthew McDonagh was not a contractor, and he was not doing work in Victim 1's neighborhood. *Id.* Matthew McDonagh gave Victim 1 a card for a "business," but that card later disappeared. Matthew McDonagh told Victim 1 that Victim 1's roof required power washing, and that Matthew McDonagh and others could perform needed work on Victim 1's home. Matthew's brother Patrick McDonagh joined shortly after Matthew's initial contact with Victim 1. Patrick also falsely claimed he was a contractor.

The parties dispute whether the McDonaghs told Victim 1 there was a hole in Victim 1's roof that required immediate attention. The evidence shows this lie was part of the fraud too: In separate interviews, Victim 1 told law enforcement that Matthew[1] told Victim 1 that there was a hole in Victim 1's roof. *See* Ex. A (Shoreline PD report), Ex. B (FBI 302). Victim 1 agreed to let Matthew inspect the roof, which he did. Matthew accessed the roof with a ladder and came back down to show Victim 1 a photograph of what he claimed he saw. *Id.* Matthew showed Victim 1 a shingle that was badly damaged and had a hole in it through which Victim 1 could see the plywood. Two images of that shingle are below: the

---

[1] The government uses Matthew and Patrick's first names to avoid confusion with one another.

United States' Sentencing Memorandum - 2
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

image on the left shows the single in evidence at Shoreline PD, the second image shows the single compared to Victim 1's roof.

 

Ex. C. Victim 1 had his roof replaced in the past two to three years, so there should not have been holes in it. The government later had an expert inspect Victim 1's roof; the expert confirmed there was no hole in Victim 1's roof that the McDonaghs fixed. Ex. D.

The parties agree that the McDonaghs also told Victim 1 they saw a crack in the home's foundation and that an exterior wall was bulging. Plea Agreement ¶ 8.i. The McDonaghs showed Victim 1 the supposed bulge, which Victim 1 told investigators was small but visible. They also showed him the crack in the foundation and an inside wall that was wet. They claimed the water was seeping through the foundation to the inside wall. The McDonaghs told him they would repair the foundation with a titanium tie-rod system that brought the foundation corners together. Plea Agreement ¶ 8.i. Before Victim 1 could

United States' Sentencing Memorandum - 3
United States v. Matthew McDonagh, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

agree to the work or seek a second opinion, the McDonaghs started digging a massive trench through Victim 1's yard. Plea Agreement ¶ 8.j.

These were all lies too. Victim 1 had no crack in his foundation, and the McDonaghs had no intention of installing a titanium tie-rod system to fix anything. Plea Agreement ¶ 8.j. The point of the trench, and the lies about expensive material to fix the foundation, was to convince Victim 1 to pay exorbitant sums of money for construction work the McDonaghs never did. Indeed, when the government later had an expert inspect Victim 1's home, the expert found that "[n]o titanium tie rod system was located, no repairs to the foundation were noticed, and no crack in the concrete/CMU block foundation wall was located either on the exterior of the house or from inside the crawl space under the laundry room." Ex. D. The McDonaghs focused on Victim 1's foundation because they suspected that Victim 1—like many people—believe foundation work is inherently expensive and dangerous if delayed.

    2.    *The McDonaghs convince Victim 1 to pay them $435,000.*

The ruse worked. Victim 1, a former Boeing employee, knew titanium was an expensive material. And the McDonaghs persuaded him that the cracked foundation, roof, and other aspects of Victim 1's home needed immediate repairs that would be extremely expensive. The McDonaghs were pushy—they invited themselves into Victim 1's home and said they were legitimate contractors wanting to help. Victim 1 felt overwhelmed and scared because of the amount of money the McDonaghs claimed it would take to fix his home. But the McDonaghs told Victim 1 the repairs were necessary, and Victim 1 believed them.

So, at the end of the first day, Victim 1 wrote Matthew McDonagh a check for $15,0000. The next day, Victim 1 wrote Matthew McDonagh two additional checks, each for $15,000. On January 13, 2024, Victim 1 wrote another check for $26,000. Plea Agreement ¶ 8.l–m.

United States' Sentencing Memorandum - 4
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The McDonaghs demanded that Victim 1 pay them more and more money over the course of the next few weeks, all the while not doing the work Victim 1 believed he was paying for. The following chart shows the checks Victim 1 wrote to Matthew McDonagh during the fraud:

| Date cashed | Amount | To | Check Memo | Check Number |
|---|---|---|---|---|
| 1/11/2024 | $15,000 | Matthew McDonagh | Wall maintenance | 10263 |
| 1/12/2024 | $20,000 | Matthew McDonagh | Foundation repair | 10262 |
| 1/12/2024 | $20,000 | Matthew McDonagh | Foundation repair | 10264 |
| 1/12/2024 | $26,000 | Matthew McDonagh | Retaining wall | 10265 |
| 1/16/2024 | $14,000 | Matthew McDonagh | Under pinning | 10266 |
| 1/16/2024 | $20,000 | Matthew McDonagh | Home repair | 10273 |
| 1/19/2024 | $20,000 | Matthew McDonagh | Home repair | 10272 |
| 1/22/2024 | $20,000 | Matthew McDonagh | Home repair | 10270 |
| 1/22/2024 | $20,000 | Matthew McDonagh | Home repair | 10269 |
| 1/22/2024 | $20,000 | Matthew McDonagh | Home repair | 10271 |
| 1/23/2024 | $20,000 | Matthew McDonagh | Home repair | 10268 |
| 1/24/2024 | $20,000 | Matthew McDonagh | Home repair | 10274 |

Victim 1 wrote checks to Matthew McDonagh, but Patrick McDonagh was the one calling the shots when it came to payments. Patrick directed Victim 1 how to transfer money from his financial counts to cover the cost of the supposed repairs, Plea Agreement 8.k, and provided Victim 1 information on how to make those transfers. *Id.* Patrick would write notes for Victim 1 directing Victim 1 what to say to the bank while moving money around.

The McDonaghs asked Victim 1 if he had a 401K and stock from his former employer, suggesting Victim 1 could use those sources to pay for the "repairs." When Victim 1 later told the McDonaghs he was running out of money, they directed Victim 1 to move money out of his retirement account. Victim 1 transferred about $357,000 out of his retirement account into his checking account to cover the supposed cost of the home repairs. Plea Agreement ¶ 8.n. Victim 1 paid this money to the McDonaghs as part of the fraud, therefore suffering a significant loss to his retirement savings. *Id.*

United States' Sentencing Memorandum - 5
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Victim 1 became skeptical of the McDonaghs when they demanded he "pay taxes" for the work they had done. PSR ¶ 16 The McDonaghs asked Victim 1 to show them his bank accounts, and he opened the accounts in front of them to show he had only $20,000 left. PSR ¶ 17. He said he would not pay the last $20,000 because he needed money to live on, and because he had already paid for everything. The McDonaghs convinced Victim to write them a check for $19,000, so he could keep $1,000 for himself. *Id.* The McDonaghs put Victim 1 under the impression they were doing him a favor and covering the $1,000 at their own loss. Victim 1's family learned of the $19,000 check and put a stop payment on it. Throughout the fraud, Victim 1 consistently asked the McDonaghs for paperwork to support the work they claimed they did, including invoices or a contract. PSR ¶ 14. The McDonaghs never provided that documentation. *Id.*

In total, Victim 1 wrote checks worth $235,000 to Matthew McDonagh, which he cashed at BECU. Matthew McDonagh told law enforcement that he paid himself, Patrick, and any other workers from the cash and provided the remaining profits to a co-conspirator. Plea Agreement ¶ 8.n.

In addition to the $235,000 in checks, the McDonaghs told Victim 1 to wire money to pay for "building materials." Plea Agreement ¶ 8.q. Victim 1 was unfamiliar with wire transfers; Patrick McDonagh directed Victim 1 to do a same day wire transfer from his BECU account, writing BECU's telephone number and directions on an envelope. An image of that note is shown below:



United States' Sentencing Memorandum - 6
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Ex. E. As directed, Victim 1 sent the $200,000 wire to a Bank of America bank account with beneficiary Unikeen STP Technologies, Inc. in Monsey, New York.[2] The purpose of the wire was "building materials." The McDonaghs did not use $200,000 worth of building materials on Victim 1's home. Several million dollars moved through the Unikeen Bank of America account in just the first two months of 2024.

B.      **Matthew McDonagh targeted Victim 5**

More than a year before Matthew McDonagh targeted Victim 1, he approached a different victim—Victim 5—in Illinois. Plea Agreement ¶ 8.t. Matthew McDonagh and a group of co-conspirators claimed they could repair Victim 5's driveway and build several retaining walls. Matthew's crew partnered with a reputable contractor to lend them legitimacy. Unbeknownst to that contractor, Matthew McDonagh and his co-conspirators had no intention of performing the work they claimed they could do for Victim 5. Rather, they used heavy machinery to rip up Victim 5's driveway. They punctured the sewage pipe and caused other damage. As with Victim 1, they demanded Victim 5 pay exorbitant sums for this incomplete and harmful work. Plea Agreement ¶ 8.t. Victim 5 paid Matthew McDonagh and others more than $75,000. *Id.* When Victim 5 reported the scam to law enforcement, Matthew McDonagh and others fled. Illinois prosecutors charged Matthew and Patrick McDonagh with home repair fraud and criminal damage for this crime.

C.      **Matthew McDonagh explained the fraud in a *Mirandized* interview.**

U.S. Customs and Border protection arrested Matthew and Patrick McDonagh in June 2024 because the McDonaghs were in the country illegally. While in ICE custody, Matthew McDonagh consented to an interview with the FBI. *See* Ex. F (redacted summary of interview).

Matthew told law enforcement he worked for Irish nationals who engaged in contractor fraud. Matthew's job was to go house-to-house to find victims. He claimed that

---

[2] Law enforcement seized this $200,000 as part of its investigation into the McDonaghs fraud and has since returned it to the victim.

United States' Sentencing Memorandum - 7
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the crew was working in the neighborhood—often a lie—and could do work on the victims' home. Matthew claimed he knocked on 200 doors per day. *Id.* Matthew's other job was to cash the checks that he collected from victims. Matthew took his payment then turned over the money to his bosses. Matthew said these bosses sometimes had victims send checks or wires to New York bank accounts, including Unikeen, where Victim 1 sent the $200,000 wire. He said Unikeen and others like it regularly launder money for construction schemes.

Matthew McDonagh admitted that his crew hit a house in Virginia for $2.2M and a two houses in Washington for $4M a piece. When asked what Matthew meant by a "house in Virginia for $2.2M," Matthew admitted that these were Victim 1-type customers, older adults who thought they were paying for work. *Id.*

**D.    The government charges Patrick and Matthew McDonagh with conspiracy and wire fraud.**

In July 2024, the government charged Patrick and Matthew McDonagh by complaint with one count of conspiracy to commit wire fraud. Dkt. No. 1. The McDonaghs made their initial appearance in federal court, and both were ordered detained. A few days later, a grand jury sitting in the Western District of Washington charged Patrick and Matthew McDonagh with one count of conspiracy to commit wire fraud, and three substantive wire fraud counts. Dkt. No. 23.

In September, Matthew McDonagh pleaded guilty to one count of conspiracy to commit wire fraud, admitting to the conduct discussed above. Dkt. No. 45. Sentencing is set before this Court on Monday, December 16, at 10 a.m.

## II.    SENTENCING GUIDELINES CALCULATIONS

The government agrees with the United States Probation Office that the total offense level is 20, and Matthew McDonagh is in criminal history category I. This yields a guidelines range of 33-41 months.

The parties agree that the base offense level is seven, a twelve-point increase applies because the fraud loss is between $250,000 and $550,000, and there is an increase of two

United States' Sentencing Memorandum - 8  
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY  
700 STEWART STREET, SUITE 5220  
SEATTLE, WASHINGTON 98101  
(206) 553-7970

levels because the offense resulted in a substantial financial hardship to Victim 1. Plea Agreement ¶ 9. There is ample evidence to support each guideline. First, as to fraud loss, Matthew McDonagh and others persuaded Victim 1 to pay them $435,000 for home repairs Victim 1 did not need, and that the crew did not complete. Plea Agreement ¶ 8.r. Matthew McDonagh used the same scam to defraud Victim 5, for a total loss of more than $500,000. Plea Agreement ¶¶ 8.t. As to substantial financial hardship (USSG § 2B1.1(b)(2)(A)(iii)), the McDonaghs convinced Victim 1 to transfer more than $350,000 out of Victim 1's retirement account to cover the cost of the supposed repairs. Plea Agreement ¶ 8.n; USSG § 2B1.1, cmt. n. 4(F) (financial hardship may include "suffering substantial loss of a retirement, education, or other savings or investment fund.").

Matthew McDonagh also participated in relocating the fraudulent scheme from Illinois to Washington, so a two-level increase under USSG § 2B1.1(b)(10)(A) applies. PSR ¶ 33. Travel was a key aspect of the McDonaghs' fraud. PSR ¶ 8. They traveled to find more victims and evade law enforcement. For example, Matthew McDonagh admits that he targeted Victim 5 in Illinois in 2023. Victim 5 reported to law enforcement, and Matthew promptly fled the state. Matthew was charged in Illinois for home repair fraud and criminal damage to property.

Matthew McDonagh timely accepted responsibility, so a three-level decrease applies under USSG § 3E1.1(a) and (b).

The following chart reflects the guidelines calculations as applied to Matthew McDonagh:

| Guideline Description | Citation | Impact |
|---|---|---|
| Base offense level | USSG §§ 2X1.1(a), 2B1.1(a)(1) | 7 |
| Fraud loss is between $250,000 and $550,000 | USSG § 2B1.1(b)(1)(G) | +12 |
| Substantial financial hardship to one or more victims | USSG § 2B1.1(b)(2)(A)(iii) | +2 |

United States' Sentencing Memorandum - 9
United States v. Matthew McDonagh, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Sophisticated means | USSG § 2B1.1(b)(10)(A) | +2 |
| Acceptance of responsibility | USSG § 3E1.1(a) and (b) | -3 |
| TOTAL OFFENSE LEVEL | | 20 |

### III.   FACTORS RELATED TO SENTENCING RECOMMENDATION

Although the nature and circumstances of Matthew McDonagh's offense are severe—he stole $435,000 from an elderly victim in our district and targeted at least one other individual with the same scheme—a guidelines sentence is not necessary to accomplish the goals of 18 U.S.C. § 3553(a). The government respectfully requests the Court sentence Matthew McDonagh to 24 months in prison. Matthew McDonagh is subject to an ICE detainer and likely will be deported upon his release from custody. The United States therefore does not recommend a term of supervised release. USSG § 5D1.1(c). The Court should also order Matthew McDonagh to pay restitution as described in the plea agreement. The 3553(a) factors amply support the government's recommendation.

**A.   This was an egregious crime.**

Two aspects of Matthew McDonagh's crime are particularly egregious: the impact on the victims and the pattern of criminal behavior.

First, the McDonaghs undermined their victims' security and caused devastating financial impact. Victim 1 is the best example. The McDonaghs targeted Victim 1 in his home. Matthew McDonagh knocked on his door and peddled lies designed to put Victim 1 at ease: That Matthew was a reputable contractor working in the neighborhood, and he noticed a hole in Victim 1's roof. Perhaps sensing Victim 1's vulnerability—Victim 1 is an older adult—Patrick and Matthew McDonagh invited themselves into his dining room, invading a sacred space usually reserved for family and close friends. There, the McDonaghs played on his fears about his home; they lied to Victim 1 about his foundation, claiming it was cracked and leaking into his laundry room. They chose the foundation for a reason: They believed, correctly, that Victim 1 would be unable to detect the fraud because a home's foundation is mostly hidden underground, and the foundations of many

United States' Sentencing Memorandum - 10  
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY  
700 STEWART STREET, SUITE 5220  
SEATTLE, WASHINGTON 98101  
(206) 553-7970

old homes have superficial cracks. They pressured Victim 1 with what they claimed was the urgency of the situation. Victim 1 told law enforcement he felt overwhelmed by the McDonaghs' pushy sales tactics and scared because of the amount of money they demanded. Victim 1 knew it was too much, but he felt he couldn't say no.

The McDonaghs' tactics were more than pushy; they were predatory. The McDonaghs demanded Victim 1 pay them exorbitant sums nearly every day of the fraud: Matthew McDonagh cashed a check for $15,000 on January 11, checks worth $66,000 on January 12, checks worth $34,000 on January 16, and checks worth $120,000 between January 19 and 24. The McDonaghs were skilled in directing Victim 1 how to move money from accounts and evade his banks' fraud detection measures. Victim 1 told law enforcement that Patrick probed for sources of money, asking about Victim 1's 401K and company stock. The McDonaghs provided Victim 1 contact information for Victim 1's financial institutions. At the McDonaghs' suggestion, Victim 1 moved $357,000 out of his retirement account to cover the cost of the supposed repairs. Plea Agreement ¶ 8.n. At one point, Victim 1 told the McDonaghs he only had $20,000 to live on; instead of showing compassion, the McDonaghs directed him to write a check for $19,000. The significant loss to Victim 1's nest egg will impact his life for years to come, including his ability to provide for himself and leave money to his children.

After cashing the checks, the McDonaghs directed Victim 1 to wire $200,000 to a company in New York for "building materials." Patrick McDonagh counseled Victim 1 how to complete the transaction, writing directions on the envelop pictured in the facts section above. The McDonaghs' persistence did not stop after the $200,000 wire. As shown below, Matthew McDonagh called Victim 1 many times in late January attempting to collect more money from him.

United States' Sentencing Memorandum - 11
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970




The result was a loss to Victim 1 of $435,000 ($200,000 of which was recovered by law enforcement). Matthew McDonagh showed this same persistence with Victim 5, out of whom he defrauded $75,000 for supposed repairs to a retaining wall and driveway.

But as Victim 1's daughter explained in her victim impact statement, the impact of this crime is more than financial. Victims of elder fraud often feel shame and a loss of dignity, as Victim 1 did here. Elder fraud undermines a victims' physical independence and security and can "lead to negative emotions, such as depression and anxiety, and psychological pressure, such as anger, self-blame, and shame, in older adult victims." Ex. G. Victim 1's daughter describes seeing some of these effects in her father. A feeling of shame is part of why elder financial fraud has such a devastating impact on our communities. In 2023, Washington seniors lost more than $88 million to elder financial

United States' Sentencing Memorandum - 12
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

scams such as the one the McDonaghs perpetrated here.[3] This figure is likely low as many such crimes go unreported. Although Matthew McDonagh sought out victims indiscriminately, both Victim 1 and Victim 5 are over the age of 60.

Here, there is an added layer of non-financial harm because the McDonaghs targeted their victims in their homes. Home is a sacred place. It is supposed to be safe. The McDonaghs undermined that sense of security for their victims. They physically invaded Victim 1's home by camping out in his dining room. And with Victim 5, Matthew McDonagh and his crew significantly damaged the victim's home by ripping up the driveway and puncturing the sewer pipe. *See* Plea Agreement ¶ 8.t. This damage is part of what makes Matthew McDonagh's fraud so pernicious. Victims feel trapped because they can see the disruption to their homes, whether in the case of a trench (Victim 1) or a ruined driveway (Victim 5). The victims continued paying the McDonaghs in part because they didn't want the property left ruined.

Second, the McDonaghs' evaded law enforcement by skipping from jurisdiction to jurisdiction. Mobility was part of the crime. Matthew McDonagh told law enforcement in a Mirandized interview that the McDonaghs targeted victims in Washington and Virginia for millions of dollars. Ex. F. Matthew McDonagh also defrauded Victim 5 in Illinois, but the McDonaghs promptly left the state when the victim reported to law enforcement. Both McDonaghs were charged for home repair fraud and criminal damage to property for stealing from Victim 5. But they did not stop the scam. Rather, they targeted Victim 1 in January 2024. This pattern, moving from victim to victim and jurisdiction to jurisdiction, shows the McDonaghs were sophisticated and aware that staying in one jurisdiction for too long could open them up to potential prosecution.

But there are aspects of Matthew McDonagh's role in the offense that militate in favor of the government's below-guidelines recommendation. Matthew McDonagh told

---

[3] Federal Bureau of Investigation, iC3 Elder Fraud State Reports, Washington State, 2023 (2024), https://www.ic3.gov/AnnualReport/Reports/2023EFState/#?s=54.

United States' Sentencing Memorandum - 13
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

law enforcement that the McDonaghs earned only about $5,000 from the scam targeting Victim 1. Matthew would cash the checks and pass the money to a third party "boss" who laundered it through companies based in New York, including the company where Victim 1 sent the $200,000 wire. This is consistent with what law enforcement found in its investigation. This suggests the McDonaghs were not the leaders of this scheme. Rather, they were akin to frontline workers, taking orders from others. *See* PSR ¶ 58. This militates in favor of the recommended sentence.

**B.     Matthew McDonagh's history and characteristics support the recommended sentence.**

Matthew McDonagh's history and characteristics support the government's and U.S. Probation's view that a within guidelines sentence is not necessary here. McDonagh had a difficult childhood, as the PSR documents. *See* PSR ¶¶ 51–56. The circumstances of his arrival in the United States and initial decision to become involved in contractor fraud also militate in favor of the below-guidelines sentence. *See* PSR ¶¶ 57–58. And, as noted, Matthew McDonagh was not the leader of this scheme nor did keep all the proceeds, even if he had direct contact with the victims.

**C.     Two years in prison will promote respect for the law and deterrence.**

A meaningful prison sentence is necessary to accomplish the 18 U.S.C. § 3553(a) goals of promoting respect for the law, encouraging deterrence, and protecting the public. Matthew McDonagh had opportunities to exit this scheme, including after he was caught defrauding Victim 5 in Illinois. He did not take this offramp, rather, he targeted Victim 1 to devastating financial effect.

But the recommended two-year sentence is also sufficient to serve these goals. The PSR notes that Matthew McDonagh has twenty-seven prior convictions in Northern Ireland. To the extent they carried any prison sentences at all, those sentences were minimal. These convictions cut both ways: On the one hand, they show that a meaningful sentence (two years) is necessary to deter future criminal conduct because lesser sentences

United States' Sentencing Memorandum - 14
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

have not accomplished that goal. On the other hand, a two-year sentence is lengthy for this individual and, for that reason, likely will deter future bad conduct.

Finally, Matthew McDonagh admitted his role in the fraud during a Mirandized interview, pre-charging. The then quickly pleaded guilty and accepted responsibility for his crimes. The PSR notes that he is remorseful. Someone who accepts responsibility and feels remorse is less likely to commit crimes in the future as compared to someone who does not express remorse. This militates in favor of the below-guidelines recommendation: Although some prison is necessary to promote deterrence, a guidelines sentence here would be too long.

A two-year sentence is also consistent with other sentences for similar crimes in this district. The recent sentence in *United States v. Bergevin*, CR24-124JNW (W.D. Wash.), provides a helpful guide. *Bergevin* was a contractor who defrauded his customers out of about $3.5 million by faking invoices from subcontractors. The Court sentenced him to forty-eight months in prison. Like Matthew McDonagh, he pleaded early and accepted responsibility for his crimes. Here, the loss associated with the McDonaghs' crime is significantly lower than Bergevin's, but there are factors here that weren't present in the *Bergevin* case. The government's recommendation of twenty-four months—half of what Bergevin got—is consistent with *Bergevin*.

United States' Sentencing Memorandum - 15
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV. CONCLUSION

For the foregoing reasons, the government respectfully recommends the Court sentence Matthew McDonagh to twenty-four months in prison.

DATED this 9th day of December, 2024.

Respectfully submitted,

TESSA M. GORMAN
United States Attorney

*s/ Lauren Watts Staniar*
LAUREN WATTS STANIAR
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-5172
Email: lauren.staniar@usdoj.gov

United States' Sentencing Memorandum - 16
*United States v. Matthew McDonagh*, CR24-120JCH

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970